IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TRACY DAORO,

      Plaintiff,

vs.

ESKATON, SPS HEALTH CARE, INC.,
OAK AVENUE PROPERTIES, LLC,
ERIK PILEGAARD, et al.,

      Defendants.

No. 2:11-cv-0960-KJM-JFM

ORDER

_____/

      On April 11, 2011, plaintiff Tracy DaOro filed a complaint alleging both state and federal claims against defendants Eskaton, SPS Health Care, Inc. ("SPS"), Oak Avenue Properties, LLC ("Oak Avenue") and Erik Pilegaard. (ECF 1.) SPS and Oak Avenue moved for summary judgment on December 18, 2012 (ECF 34) and Eskaton moved for summary judgment on December 21, 2012 (ECF 35). DaOro filed oppositions on January 4, 2013. (ECF 64, 69.) On January 18, 2013, the court heard oral argument on both motions. Manolo Olaso appeared for DaOro, David Ditora appeared for Eskaton and Barbara Blackburn appeared for SPS and Oak Avenue. For the reasons explained below, the court GRANTS the motions for summary judgment as to DaOro's federal claims and dismisses her remaining state claims.

/////

I.     BACKGROUND

    A.     Undisputed Facts[1]

        1.     FountainWood Lodge Ownership and Management

FountainWood Lodge ("FountainWood") is a senior residential facility in Orangevale, California that has been managed by Eskaton Properties, Inc. ("EPI") and its affiliate California Healthcare Consultants, Inc. ("CHC") since April 2007.  (Hammond Dep. at 18:7-13, ECF 68; Eskaton Resp. to Interrogs. at 3, ECF 53; DaOro Dep. at 11:6-8, ECF 54.)  Defendant Eskaton owns EPI; they are separate entities that have a relationship similar to that of a parent company and its subsidiary.  (Pace Decl. ¶ 5, ECF 37; Hammond Dep. at 17:13-18:5, ECF 68.)  Eskaton and EPI both are non-profit corporations that manage senior care facilities in Northern California.  (Pace Decl. ¶ 5, ECF 37.)  In 2010, the officers of Eskaton were CEO Todd Murch, CFO Bill Pace, and COO Trevor Hammond (Eskaton Resp. to Interrogs. at 3, ECF 53.)  Murch, Pace and Hammond also were the officers of EPI and CHC.  (*See* Bayless Decl. ¶¶ 1-2, ECF 38.)  Eskaton and EPI have the same human resources manager and they share personnel policies.  (Bayless Dep. at 20:7-17, ECF 56.)  The entities have approximately 1500 employees combined, with EPI itself having approximately 1500 employees and Eskaton having 44 as of 2010.  (Hammond Dep. at 20:11-19, ECF 68; Eskaton Resp. to Interrogs. at 4, ECF 53.)

Between March 1995 and April 2007, defendant SPS operated FountainWood, until transferring management to EPI.  (SPS Resp. to Interrogs. at 4, ECF 34-9.)  Because of the management transfer, SPS terminated all its employees in April 2007; most were rehired by EPI.  (*Id.* at 3.)  SPS now has no employees; it consists of five partners including defendant Pilegaard and SPS President Douglas Sutherland.  (*Id.* at 5; Sutherland Dep. at 8:5-12, ECF 61.)

---

[1] Eskaton, SPS and Oak Avenue filed statements of undisputed facts.  (ECF 34-2, 40.)  DaOro filed responses to these statements.  (ECF 70, 71.)  The parties generally agree on relevant facts, although plaintiff objects to some of the defendants' characterizations of the record in their statements of undisputed facts.  The court cites to portions of the record relied on by each party, rather than defendants' statements of undisputed fact.

1  SPS remained the owner of FountainWood until March 2011. (Sutherland Dep. at
2  21:14-19, ECF 61.) When SPS transferred management to EPI, the parties entered into an
3  agreement describing the roles and duties of each. The agreement provided that SPS would

> (i) retain general control over the operation of [FountainWood] including but not limited to the budget approval, distribution and use of owners [sic] proceeds from operations and the advance approval on all non-budgeted, non-emergency expenditures in excess of $2,500, (ii) maintain, and retain full responsibility under, all licenses, certificates, permits and approvals necessary for the operation of [FountainWood]. . .

(Assisted Living Mgmt. Agreement, ECF 34-6.) EPI's duties were to

> "(a) Manage and supervise the operations of [FountainWood], in all respects . . . . (l) At the expense of [SPS], provide a qualified full-time [A]dministrator at [Fountainwood]; The Administrator selection will be made with the prior approval of [SPS] . . . . The Administrator . . . shall assume general day-to-day administrative and operational responsibility for [FountainWood] . . . .

(*Id.*)

The agreement states further that

> The Administrator will be an employee of [EPI] . . . . and shall not be deemed or construed to be an employee of CHC or [SPS]. All compensation and other amounts payable with respect to the Administrator . . . will be charged as operating expenses to [SPS] at the [EPI]'s actual expense."

(*Id.*)

      2.    DaOro's Employment at FountainWood

Plaintiff DaOro worked at FountainWood from 1995 until 2000 and again from 2006 until 2010. (SPS Resp. to Interrogs. at 3, ECF 34-9; DaOro Dep. at 10:3-11, ECF 54.) During the time that SPS managed FountainWood, DaOro was an SPS employee. (SPS Resp. to Interrogs. at 5, ECF 34-9.) When SPS transferred management to EPI, DaOro became an employee of CHC. (Bayless Decl. ¶ 2, ECF 38.) On October 15, 2007, DaOro was promoted to the position of FountainWood administrator and became an EPI employee. (*Id.*)

While DaOro worked as the FountainWood administrator, EPI paid her salary. (Pace Decl. ¶ 6, ECF 37.) EPI was responsible for her performance evaluations. (DaOro Dep. at

3

1  258:15-17, ECF 55.)  Hammond was DaOro's direct supervisor.  (Hammond Dep. at 17:4-9,
2  ECF 68.)  DaOro met monthly with Sutherland and Hammond to review FountainWood
3  operations.  (Sutherland Dep. at 12:11-15, ECF 61; DaOro Dep. at 23:16-24:12, ECF 34-5.)  At
4  one point, Sutherland instructed DaOro on renovations to the FountainWood dining room.
5  (DaOro Dep. at 243:6-14, ECF 67.)  She also met monthly with Murch at Eskaton's corporate
6  offices. (DaOro Dep. at 19:2-17, ECF 67.)

7  In May 2010, DaOro went on paid administrative leave from FountainWood after
8  complaining about sexually inappropriate behavior from Pilegaard.  (Bayless Decl. ¶¶ 16-18,
9  ECF 38.)  DaOro left her position on August 31, 2010.  (*Id.* ¶ 20.)

10  B.  DaOro's Claims

11  DaOro has alleged ten causes of action: (1) Sexual harassment in violation of
12  Title VII, 42 U.S.C. § 2000e, *et seq.* against Eskaton and SPS; (2) Sexual harassment in violation
13  of the Fair Employment and Housing Act (FEHA), Cal. Gov't Code § 12900, *et seq.*, against
14  Eskaton and SPS; (3) Failure to prevent sexual harassment in violation of FEHA, Cal. Gov't
15  Code § 12940(k), against Eskaton and SPS; (4) Sexual harassment in violation of California
16  Civil Code § 51.9, against Pilegaard and Oak Avenue; (5) Retaliation in violation of Title VII,
17  against Eskaton and SPS; (6) Retaliation, in violation of FEHA, Cal. Gov't Code 12940(h),
18  against Eskaton and SPS; (7) Retaliation, in violation of California Labor Code § 1102.5, against
19  Eskaton and SPS; (8) Wrongful discharge in violation of public policy, under California
20  common law, against Eskaton and SPS; (9) Sexual Battery, under California common law,
21  against Pilegaard; and (10) Negligence, under California common law, against Eskaton, SPS,
22  Oak Avenue and Pilegaard. (Compl., ECF 1.)

23  III.  ANALYSIS

24  A.  Summary Judgment Standard

25  A court will grant summary judgment "if . . . there is no genuine dispute as to any
26  material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

4

1  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be
2  resolved only by a finder of fact because they may reasonably be resolved in favor of either
3  party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[2]

4  The moving party bears the initial burden of showing the district court "that there
5  is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*,
6  477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish
7  that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio
8  Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to
9  particular parts of materials in the record . . .; or show [] that the materials cited do not establish
10 the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible
11 evidence to support the fact." FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586
12 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt
13 as to the material facts"). Moreover, "the requirement is that there be no *genuine* issue of
14 *material* fact . . . . Only disputes over facts that might affect the outcome of the suit under the
15 governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at
16 247-48 (emphasis in original).

17 In deciding a motion for summary judgment, the court draws all inferences and
18 views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at
19 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a
20 whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine
21 issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.
22 Co.*, 391 U.S. 253, 289 (1968)).
23 /////

---

25 [2] Rule 56 was amended, effective December 1, 2010. However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010
26 amendments.

B.   SPS and Eskaton Motions on Title VII Claims

SPS and Eskaton both argue that DaOro cannot sustain her Title VII claims for sexual harassment or retaliation against them, as neither was her employer. Because "Congress' objective was 'to achieve equality of employment opportunities'. . . . there must be some connection with an employment relationship for Title VII protections to apply." *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 (9th Cir. 1980) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 429 (1971)). "Once a contractual relationship of employment is established, the provisions of Title VII attach and govern certain aspects of that relationship." *Hishon v. King & Spalding*, 467 U.S. 69, 74 (1984). Conversely, Title VII protections do not apply where there is no employment relationship. *Compare Murray v. Principal Fin. Group, Inc.*, 613 F.3d 943, 945 (9th Cir. 2010) (independent contractors are not entitled to Title VII protections because they are not employees) *with Ass'n of Mexican-Am. Educators v. State of California ("AMEA")*, 231 F.3d 572, 582 (9th Cir. 2000) (state was bound by Title VII in relationship with teachers employed by local school districts, as state had ability to interfere with employment relationship). The court concludes that neither SPS nor EPI was DaOro's employer at the time relevant to this action, as explained below.

1.   SPS

SPS asserts it does not meet Title VII's definition of "employer," 42 U.S.C. § 2000e(b), because DaOro was terminated by SPS after SPS transferred management of FountainWood to EPI in April 2007. (ECF 34-1 at 10.) Moreover, SPS has no employees, and the Section 2000e(b) definition of "employer" requires at least fifteen employees. (ECF 34-1 at 10.) DaOro argues that "[t]he Ninth Circuit has adopted three different tests for determining whether two entities are jointly liable as employers under Title VII," and that under either the "joint liability" test or the "integrated enterprise test," SPS is an employer for the purposes of Title VII. (ECF 69 at 10-13.)

/////

DaOro's understanding of the law as to the integrated enterprise test is incorrect; "the test does not determine joint *liability* . . . but instead determines whether a defendant *can meet the statutory criteria* of an 'employer' for Title VII applicability." *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 928 (9th Cir. 2003) (emphasis in original).  According to the *Anderson* court, the integrated enterprise test is relevant when a plaintiff alleges that her direct employer has committed discriminatory conduct but the direct employer cannot be held liable under Title VII because it has fewer than fifteen employees. *Id.* at 929.  If the court determines that the direct employer and another, larger employer are an integrated enterprise, the plaintiff may maintain a Title VII claim against the direct employer despite its individual size.  *Id.*  "But, when there is no dispute that at least one defendant qualifies as an employer under Title VII, the integrated enterprise test is inapplicable." *Drottz v. Park Electrochemical Corp.*, No. CV 11-1596-PHX-JAT, 2012 WL 1344729, at *3 (D. Ariz. Apr. 18, 2012).  Here, DaOro alleges that SPS is liable under Title VII for discriminatory conduct that occurred while EPI was her direct employer.  The integrated enterprise test is inapplicable for two reasons.  DaOro does not allege that SPS was her sole direct employer under Title VII and her actual employer, EPI, meets the criteria as an employer for Title VII liability.[3]  Accordingly, SPS can not be liable for Title VII violations under this theory.

Regarding DaOro's second argument, it is unclear whether the joint liability test can establish Title VII liability.  Under the joint liability test, "[t]wo or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment

/////
/////
/////
/////

---

[3] While plaintiff's counsel at hearing indicated plaintiff did not know EPI was her employer at the time she filed the complaint, plaintiff has not sought leave to amend.

7

of the employee." *Wynn v. Nat'l Broad. Co., Inc.*, 234 F. Supp. 2d 1067, 1093 (C.D. Cal. 2002).

> To determine whether a joint employment relationship exists, the Ninth Circuit applies an economic reality test that takes into account all factors relevant to the particular situation. For example, the Ninth Circuit has considered whether the alleged joint employer (1) supervised the employee, (2) had the power to hire and fire [her], (3) had the power to discipline [her], and (4) supervised, monitored and/or controlled the employee and his work site.

*U.S. E.E.O.C. v. Global Horizons, Inc.*, 860 F. Supp. 2d 1172, 1183 (D. Haw. 2012) (citations and quotations omitted).

The joint liability test has been used by courts to evaluate the liability of an entity under FEHA, *see, e.g., Wynn*, 234 F. Supp. 2d at 1093, as well as Fair Labor Standard Act claims, *e.g., Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983). The Ninth Circuit Court, however, effectively withdrew its only opinion applying this standard in a Title VII case, without rehearing the case once the parties stipulated to dismissal. *See EEOC v. Pacific Maritime Ass'n*, 351 F.3d 1270 (9th Cir. 2003), *reh'g granted*, 367 F.3d 1167 (9th Cir. 2004). The order granting rehearing states that the previous opinion "shall not be cited as precedent" unless adopted by the court en banc. *See Pacific Maritime Ass'n*, 367 F.3d at 1167. Nonetheless, several district courts have continued to apply this standard when evaluating claims under Title VII, finding *Pacific Maritime Association* to be persuasive if not directly applicable. *See Drottz*, 2012 WL 1344729, at *5 n.6 (collecting cases). Although the court in *Drottz* also asserts that the Ninth Circuit approved of using the joint employer test in the Title VII context in the later *Murray* case, that case clarified the standard for distinguishing between employees and independent contractors, not for identifying which entity is a plaintiff's employer. *See id.* (citing *Murray*, 613 F.3d at 945).

Even assuming without deciding that the joint liability test applies in the Title VII context, DaOro has not alleged facts sufficient to show that SPS exercised the requisite control over her employment for SPS to be a joint employer. DaOro argues there was control because

her appointment as administrator of FountainWood was subject to SPS's approval under the management agreement with EPI, SPS President Sutherland met with her monthly, and Sutherland gave her instructions for modifying the FountainWood dining hall. (ECF 69 at 12.) Nonetheless, DaOro does not dispute that she was an official employee of EPI, that EPI paid her salary, and that SPS had no influence over her day-to-day activities or her performance evaluations. In light of the degree of control required to find that a defendant is a joint employer, DaOro has not shown that SPS controlled the terms and conditions of her employment.

In an analogous case, in a Title VII case filed by foreign workers against both a recruitment company and the farms in the United States where they worked, the court used the joint liability test to determine that the foreign workers sufficiently alleged that the farms and the company "jointly controlled the terms and conditions of employment," denying the farms' motions to dismiss. *Global Horizons*, 860 F. Supp. 2d at 1178, 1182-83. In a contrasting case, a mechanic worked for one company, which then entered into a contract agreeing that the mechanic would work for a second company. *Rubino v. ACME Bldng. Maint.*, No. C 08-00696 JW, 2008 WL 5245219, at *4-5 (N.D. Cal. Dec. 15, 2008). The mechanic alleged that the second company controlled his break schedule and duties and directly benefitted from his work. *Id.* Nonetheless, the court granted the second company's motion to dismiss, determining that the mechanic had not sufficiently alleged that the second company had control over his employment. *Id.*

Here, as DaOro cannot show that SPS was her employer for the purposes of Title VII, the court grants SPS's motion for summary judgment on the Title VII claims for sexual harassment and retaliation.

2. Eskaton

Eskaton argues that DaOro cannot succeed on her Title VII claims against it because EPI, not Eskaton, is her employer. (ECF 39 at 1-2.) DaOro contends that Eskaton should be considered her employer under an integrated enterprise, joint employer, or agency

theory.  (ECF 64 at 13-17.)  For the reasons explained above, the court considers only the joint employer and agency theories.

DaOro's argument under the joint employer test is essentially that because EPI and Eskaton share the same human resources department and officers, including Hammond as a supervisor, any of the numerous actions by Murch or Hammond regarding DaOro's employment with EPI should also be considered actions by Eskaton.  (ECF 64 at 15-16.)  These facts do not show that Eskaton was DaOro's joint employer, however.  Courts generally apply the joint employer test when otherwise separate entities each exercise some control over an employee.  *See, e.g., Bonnette*, 704 F.2d at 1470 (discussing whether under joint employer test, at-home care providers were employees both of counties responsible for obtaining their services and the individual care recipients); *Global Horizons*, 860 F. Supp. 2d at 1182-83 (discussed above).  Here, in contrast, Eskaton and EPI are related entities and DaOro does not provide any facts showing that Eskaton was her employer independently from EPI.

DaOro's agency argument is that Eskaton is liable for EPI's alleged violations of Title VII because Eskaton is EPI's parent company.  (ECF 64 at 17.)  But "[i]n the absence of special circumstances, a parent corporation is not liable for the Title VII violations of its wholly owned subsidiary." *AMEA*, 231 F.3d at 582 (citing *Watson  v. Gulf & W. Indus.,* 650 F.2d 990, 993 (9th Cir. 1981)).  Special circumstances include "[i]f there was any evidence that [the parent company] participated in or influenced the employment policies of [the subsidiary], or if [the parent company] had undercapitalized [the subsidiary] in a way that defeated potential recovery by a Title VII plaintiff." *Watson*, 650 F.2d at 993.  Special circumstances existed in *AMEA* because the State of California, whose relationship with local school districts was analogous to that of a parent company, mandated testing for district teaching candidates that minority candidates alleged was discriminatory.  231 F.3d at 582.  In contrast, DaOro presents no evidence that special circumstances are present here.

/////

1  In sum, DaOro has not demonstrated that a reasonable fact-finder could determine that Eskaton was her employer under Title VII. The court grants Eskaton's motion for summary judgment on the federal claims for sexual harassment and retaliation.

C. DaOro's Remaining Claims

Having granted summary judgment on DaOro's federal claims, the court has discretion not to exercise jurisdiction over her state claims. 28 U.S.C. § 1367. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). *See also City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1008 (9th Cir. 2010) (no abuse of discretion when district court dismissed state claims after granting summary judgment on federal claims). Here, no factors weigh in favor of this court retaining jurisdiction.

Accordingly, DaOro's remaining claims are dismissed.

DATED: February 28, 2013.

_____
UNITED STATES DISTRICT JUDGE